IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUN 20 2017

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

PLANNED PARENTHOOD ARKANSAS &
EASTERN OKLAHOMA d/b/a PLANNED
PARENTHOOD GREAT PLAINS, on behalf
of itself and its patients, and LITTLE ROCK
FAMILY PLANNING SERVICES, on behalf
of itself and its patients,

                    Plaintiffs,

v.

NATHANIEL SMITH, in his capacity as
Director and State Health Officer,
ARKANSAS DEPARTMENT OF HEALTH,

                    Defendant.

No. 4:17cv401 - JM

This case assigned to District Judge Moody
and to Magistrate Judge Kearney

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

Plaintiffs Planned Parenthood Arkansas & Eastern Oklahoma, d/b/a Planned Parenthood

Great Plains ("PPGP") and Little Rock Family Planning Services ("LRFP"), by and through their

undersigned attorneys, bring this Complaint against the above-named Defendant, his employees,

agents, delegates, and successors in office, and in support thereof allege the following:

**I.   PRELIMINARY STATEMENT**

1.      Plaintiffs bring this action seeking declaratory and injunctive relief on behalf of

themselves and their patients under the United States Constitution and 42 U.S.C. § 1983, to

challenge section 2 of Arkansas Act 383, Reg. Sess. (2017) ("Act 383" or "the Act"), to be

codified at Ark. Code Ann. § 20-9-302 *et seq.*, which, unless enjoined by this Court, will violate

the constitutional rights of Plaintiffs and their patients by, inter alia, singling them out for

differential treatment, and impermissibly burdening access to abortion in Arkansas.  The Act will

go into effect on July 30, 2017, and a copy of it is attached hereto as Exhibit A.

2. The Act amends the licensing scheme for abortion clinics to require that Defendant Arkansas Department of Health ("Defendant" or "ADH") "shall" suspend or revoke the licenses of abortion clinics for "the violation of *any* provision of law or rule." Act 383, 91st General Assemb., Reg. Sess. (Ark. 2017), *to be codified at* Ark. Code Ann. § 20-9-302(b), (b)(3)(A) & (b)(3)(A)(i) (the "Mandatory Suspension/Revocation Provision") (emphasis added). That means that *any* minor infraction related to the hundreds of legal requirements that apply to abortion clinics will result in *mandatory* suspension or revocation of the abortion clinic's license, regardless of whether the infraction poses any risk to patient health or safety.

3. No other licensed medical providers in Arkansas are subject to such extreme and mandatory penalties. And for good reason—licensed health care facilities in Arkansas, including Plaintiffs, routinely receive notice of minor infractions for failure to maintain perfect compliance with the Department's interpretation of their regulatory obligations. These types of deficiencies do not pose any threat of harm to patients, and are promptly corrected by the provider, without any need to impose penalties on the provider's license or disrupt patient access to services. In fact, on information and belief, Defendant has *never* imposed the drastic penalty of license revocation or suspension, or issued notices of such action, on any abortion clinic in the state. Nor has the Defendant imposed these penalties on *any* ambulatory surgery center or freestanding birthing center in at least the past five years.

4. If any one of the three Arkansas abortion clinics operated by Plaintiffs has its license revoked or suspended, that clinic would have to stop providing abortions, forcing Arkansas women to seek abortion care at one of the remaining clinics, if that clinic has not also been shut down by the Mandatory Suspension/Revocation Provision and is able to accommodate them.

5.      If LRFP's license is revoked or suspended, women would be unable to access surgical abortion care in Arkansas, as LRFP is the only generally available provider of that care in the state.  Likewise, women would be unable to access abortion care in Arkansas past the tenth week of pregnancy, as measured from the first day of their last menstrual period ("LMP"), as LRFP is the only generally available provider of that care past ten weeks LMP in Arkansas.

6.      If all three of the clinics' licenses were suspended or revoked, abortion access in Arkansas would be virtually eliminated.

7.      The requirements in the Act–which impose these burdens without any medical justification and which are motivated by animus towards abortion–violate the constitutional rights guaranteed to Plaintiffs and their patients by the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution. Permanent injunctive relief is necessary to protect the health of Arkansas women and the constitutional rights of Plaintiffs and their patients.

## II.      JURISDICTION AND VENUE

8.      Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343(a)(3). Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.

9.      Venue in this judicial district is appropriate under 28 U.S.C. § 1391.

## III.      THE PARTIES

### A.      Plaintiffs

10.      Plaintiff PPGP is a not-for-profit corporation headquartered in Overland Park, Kansas and licensed to do business in Arkansas.  It operates two of the three abortion-providing

health centers in the state, located in Little Rock and Fayetteville. The healthcare services provided by PPGP at its two Arkansas health centers include well-woman exams, testing and treatment for sexually transmitted infections, provision of birth control and emergency contraception, HIV testing, pregnancy testing, screening for vaginal infections, and human papillomavirus ("HPV") vaccinations. PPGP also provides medication abortions in Arkansas to women through ten weeks LMP. PPGP or predecessor organizations have provided high-quality reproductive healthcare in Arkansas for more than thirty years, and have offered medication abortion for the past seven years. PPGP brings this action on behalf of itself, its patients, and the physicians it employs to provide services to its patients.

11.     Plaintiff LRFP is a professional limited liability corporation that is licensed to do business in Arkansas. It has provided high-quality abortion care in Arkansas since 1973. It operates a clinic in Little Rock that provides both medication and surgical abortion care. Surgical abortions are offered until twenty-one weeks and six days LMP (nineteen weeks and six days "post-fertilization"). In addition to abortion care, LRFP offers miscarriage care and basic gynecological care, including pap smears, sexually transmitted disease testing, and contraceptive counseling and services. LRFP brings this action on behalf of itself, its patients, and the physicians it employs to provide services to its patients.

**B.     Defendant**

12.     Defendant Nathaniel Smith is the Director and State Health Officer of the Arkansas Department of Health, the agency charged with enforcing the Act. Ark. Code Ann. § 20-7-103(b)(1). Defendant Smith is sued in his official capacity.

4

## IV.   FACTUAL ALLEGATIONS

### A.   Background on Abortion

13.    Women seek abortions for a variety of medical, psychological, emotional, familial, economic, and personal reasons. Approximately one in three women in the United States will have an abortion by age 45.

14.    Both medication abortion and surgical abortion are currently available in Arkansas.

15.    In a medication abortion, a patient is given medications by mouth that cause her to expel the products of conception in a process similar to a miscarriage. She first takes one medication, and then takes a second medication 24–48 hours later at a location of her choosing, most often at home. The second medication causes the expulsion of the contents of the uterus. Medication abortion is commonly and safely provided in doctors' offices and office-style facilities across the country.

16.    Surgical abortion is a method of ending a pregnancy by using instruments to evacuate the contents of the uterus. Surgical abortion is comparable to other gynecological procedures performed in an outpatient setting in terms of risk, invasiveness, instrumentation, and duration.

17.    Currently, women in the first ten weeks of pregnancy LMP have the option of choosing a medication abortion, an extremely safe and effective method, at PPGP's two Arkansas health centers. In 2016, PPGP's physicians provided nearly 600 medication abortions at its Arkansas health centers. Over half of these abortions were provided in Fayetteville, where PPGP is the only generally available abortion provider.

5

18.     LRFP offers patients both medication abortion and surgical abortion. Surgical abortion is available at LRFP early in a woman's pregnancy and until twenty-one weeks, six days LMP.  On average physicians at LRFP provide over 3000 abortions each year.

19.     LRFP is the only generally available provider of surgical abortion in Arkansas.

20.     Legal abortion is one of the safest and most common procedures in contemporary medical practice.  The United States Supreme Court recently affirmed that "abortions taking place in an abortion facility are safe—indeed safer than numerous procedures that take place outside of hospitals," and noted that both childbirth and colonoscopies have higher mortality rates than abortion.  *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2315 (2016), *as revised* (June 27, 2016) (childbirth's mortality rate is fourteen times that of abortion, and colonoscopy's mortality rate is ten times that of abortion).

**B.     Current Inspection Process for Arkansas Abortion Clinics**

21.     As licensed abortion clinics in Arkansas, Plaintiffs' clinics are already subject to periodic inspections by Defendant.  *See* Ark. Code Ann. § 20-9-302(a)(2) ("The facilities, equipment, procedures, techniques, and conditions of those clinics or similar facilities shall be subject to periodic inspection by the department.").

22.     Historically, these inspections have been unannounced, and have occurred at least annually, and sometimes more frequently.  *See* Ark. Admin. Code § 007.05.2-4(J) ("Any authorized representative of the Arkansas Department of Health shall have the right to enter upon or into the premises of any Abortion Facility at any time in order to make whatever inspection it deems necessary in order to assure minimum standards and regulations are met.").

23.     Historically, the Department has also conducted inspections in response to completely unfounded "complaints" filed against abortion clinics by anti-abortion activists

through the Department's online complaint form, *see* Ark. Dep't of Health, Complaint Form, http://www.healthy.arkansas.gov/programsServices/hsLicensingRegulation/HealthFacilityServic es/Pages/ComplaintForm.aspx (select "Abortion Clinics" from drop-down menu of facility types).  The Department typically responds to such complaints by conducting unannounced inspections of Plaintiffs' health centers.

24.    After each health center's inspection, if there are any purported violations of law or regulation that the inspectors observed, the health center receives a "Statement of Deficiencies" detailing the claimed violations, and asking the health center to submit a "Plan of Correction" to come into compliance with the applicable law or regulation.  Once the Plan of Correction is accepted by the Department, no further action on the health center's license is taken.

25.    Upon information and belief, all licensed health care providers regulated by Defendant (including, for example, ambulatory surgical centers, freestanding birthing centers, and other licensed entities that do *not* provide abortion) routinely receive Statements of Deficiencies following Defendant's inspections for failure to maintain perfect compliance with Defendant's interpretation of all applicable laws and regulations.  The issuance of a Statement of Deficiencies, therefore, is not an extraordinary or abnormal result after an inspection of a health center.  In fact, it is routine.

26.    In keeping with this general practice, Plaintiffs regularly receive a Statement of Deficiencies following each of their health centers' respective inspections.  These "deficiencies" typically pertain to minor oversights that can be and are corrected expeditiously by health center staff and that do not pose any threat to patient safety or health.

27.     Many of the laws and rules that apply only to abortion clinics in Arkansas impose vague requirements that are open to interpretation.  For example, an abortion clinic's "building and equipment shall be maintained in a state of good repair at all times," and "[t]he premises shall be kept clean, neat, free of litter and rubbish."  Ark. Admin. Code 007.05.2-12(C)(3)–(4).  In addition, the abortion clinic must have written policies and procedures on broad topics such as "housekeeping," "laundry," "preventative maintenance," and "patient care." *Id.* at 007.05.2-6(M).  Given the broad nature of such requirements, Defendant has routinely cited Plaintiffs' health centers for failure to comply with its interpretation of the applicable laws and regulations.

### C.      PPGP's Licensure History

28.     PPGP's two Arkansas heath centers have been licensed as abortion clinics since 2012, the year when these health centers began offering medication abortion.

29.     Since becoming licensed as abortion facilities, PPGP's health centers in Little Rock and Fayetteville have been inspected by Defendant at least twelve times.  After nine of these inspections, Defendant notified PPGP of its purported failure to comply with some law or regulation.

30.     The minor deficiencies noted during PPGP's inspections over the past five years include, for example, the alleged: failure to document that the emergency contact list is updated every six months; failure to have evidence of updated CPR-certification and updated TB skin testing for certain staff; improper placement of a box containing supplies on the floor; failure to label the dates that disinfection monitoring supplies were opened or prepared; and failure to remedy a torn cover on a piece of furniture.

31.     These violations were all promptly corrected by PPGP's staff, without any disruption in services to PPGP's patients or any actions taken against PPGP's licenses.  PPGP

submitted timely Plans of Correction, which Defendant deemed acceptable to remedy any violations noted during the inspections.

### D.    LRFP's Licensure History

32.    LRFP's clinic has been licensed since approximately 1985.

33.    From 2012 through 2016, Defendant inspected LRFP at least thirteen times.

29.    After these inspections, LRFP has also regularly received a Statement of Deficiencies for minor oversights that can be and are corrected expeditiously by staff, and that do not pose a threat to patient safety or health.

30.    The minor deficiencies noted during LRFP's inspections during the past five years include, for example, the alleged need to make a minor alteration in documentation in patient charts; to remove cloth chairs in the clinic's patient recovery area; to remove a stain on ceiling tile; to remove dust on an ultrasound cart; and to test high level disinfection solution more frequently.

31. These deficiencies were all promptly corrected by LRFP's staff, without any disruption in services to its patients or any actions taken against LRFP's license.   LRFP submitted timely Plans of Correction, which Defendant deemed acceptable to remedy any violations noted during the inspections.

### E.    Current Discretionary Authority To Suspend or Revoke Licenses

34.    Prior to the Act, Defendant had the discretionary authority, under Arkansas law, to suspend or revoke the license of any abortion facility based on violation of any applicable law or regulation. *See* Ark. Admin. Code 007.05.2-8(G) ("The Department *may* deny, suspend, or revoke the license of any Abortion Facility on the following grounds: violation of any of the provisions of the Act or Rules and Regulations lawfully promulgated hereunder").   And

Arkansas law made clear that such actions are appropriate if the facility's conduct poses a threat to patient safety or health. *See id.* (authorizing license suspension or revocation for "conduct or practices detrimental to the health or safety of patients and employees of [abortion] facilities").

35.     Yet, Defendant has not deemed it appropriate to suspend or revoke Plaintiffs' licenses based on any of the violations it found during inspections of their health centers, presumably because it (correctly) did not consider them to rise to the level that would make such suspension or revocation appropriate.

36.     Defendant also has the discretionary authority to suspend or revoke the license of other licensed health care facilities in Arkansas based on violations of applicable laws or regulations. *See, e.g.* Ark. Code Ann. § 20-9-215(a) (governing hospitals, ambulatory surgical centers, and related institutions) ("The State Board of Health is empowered to deny, suspend or revoke licenses on any of the following grounds: (1) Violation of any of the provisions of this subchapter or the rules and regulations lawfully promulgated under this subchapter . . . "); Ark. Admin. Code 007.05.12-4(D) (governing free-standing birthing centers) (allowing a license to be renewed annually, "unless revoked"). In addition, the Arkansas Administrative Procedure Act makes clear that a revocation or suspension of a license is unlawful unless the licensee is provided with "an opportunity to show compliance with all lawful requirements for the retention of the license." Ark. Code Ann. § 25-15-211(c).

37.     Thus, until the Act, the Department's discretionary power to revoke or suspend the license of abortion facilities for legal or regulatory violations was similar to its discretionary powers in regulating other licensed health care facilities.

38.     Again, in at least the past five years, Defendant has not initiated proceedings to suspend or revoke the license of any outpatient surgery center/ambulatory surgery center or

freestanding birth center in the entire state.  Nor, upon information and belief, has the Defendant *ever* attempted to suspend or revoke the license of any abortion clinic in the state.  Again, presumably that is because none of the violations observed during the hundreds of inspections performed on these health centers have risen to the level that would make such suspension or revocation appropriate.

### F.    The 91st General Assembly's Attack on Abortion

39.    The 91st General Assembly of the Arkansas legislature launched a broad-scale attack on abortion rights, passing numerous laws that restrict access to abortion and target abortion providers and their patients for unfair treatment.

40.    These laws include: a ban on the safest and most common second trimester method of abortion (Act 45); a medical records mandate that requires abortion providers to spend "reasonable time and effort" obtaining the medical records related to the woman's entire pregnancy history (Act 733); a requirement that for all abortion patients under 17 years old, the provider must preserve extracted embryonic or fetal tissue from the abortion and disclose the fact of the abortion to the minor's local police department, even in the absence of criminal activity (Act 1018); and a law that establishes elaborate consent requirements for and may restrict the methods of disposal of embryonic or fetal tissue, importing procedures from a much different context that could bar abortions (Act 603).

41.    These laws from the 91st General Assembly are the subject of a separate lawsuit challenging their constitutionality.

42.    The Act is yet another attack on Arkansas abortion providers and their patients.

### G.   The Act

43.     The Act changes Arkansas law to make abortion clinics the *only* licensed health care facilities in Arkansas that are subject to mandatory license suspension or revocation based on *any* violation of the applicable laws or regulations, no matter how minor or how irrelevant to patient health and safety.

44.     The Act's Mandatory Suspension/Revocation Provision states that "the department shall . . . deny, suspend, or revoke licenses on any of the following [] grounds: (i) The violation of any provision of law or rule . . . ." Ark. Code Ann. § 20-9-302(b), (b)(3)(A) & (b)(3)(A)(i).

45.     Under the terms of the Act, the licensee will receive a written notice setting forth the reason for the suspension or revocation, and the "suspension[] or revocation shall become final thirty (30) days after the mailing of the notice unless the applicant or licensee gives written notice within the thirty-day period of a desire for a hearing." *Id.* at § 20-9-302(b)(3)(B)(ii).   In contrast, when a violation of a state law, rule, or regulation poses an "imminent threat to the health, welfare, or safety of a patient," license suspension "is effective upon the receipt of the written notice." *Id.* at (b)(3)(B)(iii).

46.     Thus, for claimed violations of a law or rule that do not pose an imminent threat to the health, welfare, or safety of a patient, suspension or revocation does not take effect for a minimum of thirty days after the mailing of the written notice.   However, Defendant has no discretion as to whether license suspension or revocation is an appropriate consequence for any violation (regardless of how minor); it is required to impose suspension or revocation.

47.     The Act will go into effect on July 30, 2017.   Once the Act goes into effect, each of Plaintiffs' health centers will face imminent licensure suspension or revocation proceedings

based on any minor deficiency noted during the next unannounced inspection of any of these three health centers.

48.     The Act's sponsor claimed during the legislative debates that the Act simply "protects the health of the patient." *Hr'g Before House Committee on Public Health, Welfare, and Labor*, 91st General Assemb., Reg. Sess. (Ark. 2017) (statement of Rep. Robin Lundstrum), *available at:* http://www.arkansashouse.org/video-library at 11:29:59-11:30:05 (select Feb. 9, 2017; then select "Public Health, Welfare, and Labor Committee").  But there is absolutely no support for the claim that the Mandatory Suspension/Revocation Provision protects patient safety or health.  None of the minor legal or regulatory violations noted during inspections of abortion facilities have posed any threat to patient health that would justify licensure suspension or revocation.

49.     And if there was a threat to health and safety, not only did the old regulatory scheme give the Department the authority to take action, but the Act separately requires the Department to issue an immediate suspension of an abortion clinic's license if a violation poses an "imminent threat to the health, welfare, or safety of a patient," Ark. Code Ann. § 20-9-302(b)(3)(iii)(a), a provision which Plaintiffs do not challenge here.

50.     Nor is there any legitimate health or safety rationale for imposing this mandatory penalty only on abortion providers and their patients.  As noted above, abortion is an exceedingly safe procedure, with complication rates that are far lower than the complication rates of other medical procedures.

51.     In fact, versions of Defendant's own Impact Statement on the Act, attached as Exhibit B, recognized that the Act "holds abortion facilities to a suspension standard unlike all other licensed facilities.  No other health care facility licensed via HFS ["Health Facility

Services"] receives a suspended license upon inspection with rule violation.  Facilities such as hospitals and ambulatory surgery centers submit plans of correction for each violation.  When a violation of imminent threat of harm is identified the survey process requires correction at time of survey with no license suspension.  This bill requires suspension of the abortion facility license."

52.     Defendant further noted as one of the Act's "Weaknesses" that it improperly "[b]ypasses Board of Health's authority for suspending licenses."  *Id.*  In other words, the Act *requires* suspension or revocation, rather than permitting the Board to exercise its authority to determine when such actions are appropriate.

53.     Furthermore, this Impact Statement noted that Defendant "anticipate[s] significant increase in complaint allegations in an effort to have facility license suspended as means of preventing this service to patients.  It has not been uncommon for HFS to receive complaint allegations which are not substantiated upon investigation by HFS."  *Id.*

54.     Thus, the only plausible motivation for the Mandatory Suspension/Revocation Provision is animus towards abortion.  The Act will itself threaten patient safety and health if it results in the mandatory shut down of one, or all, of the state's abortion clinics, forcing women to seek later abortions, if they can access them at all.

### H.     The Impact of the Act

55.     The Act singles out abortion facilities for differential treatment for no medical or rational reason whatsoever by requiring the grossly excessive penalty of license suspension or revocation for any violation of law or regulation no matter how minor.

56.     Once the Act goes into effect, any minor deficiency noted during an inspection of any of Plaintiffs' health centers will result in suspension or revocation of the health center's

license.   The Act separately requires inspection to be done "at least annually" and on an unannounced basis.   Act, *to be codified at* Ark. Code Ann. § 20-9-302(a)(2)(A) & (B).

57.     Based on prior history, Plaintiffs credibly fear that any inspection of its health centers will result in a minor deficiency that poses no threat to patient safety or health but that nonetheless will result in mandatory revocation or suspension of the health center's abortion facility license.

58.     Such revocation or suspension will cause immediate harm to Plaintiffs' reputations.   Anti-abortion advocates routinely obtain, pursuant to the Arkansas Freedom of Information Act, Ark. Code Ann. 25-19-105, copies of documents related to Defendant's inspections and licensing of Plaintiffs and have posted such documents online in the past.   Thus, Plaintiffs fear that any notice of revocation or suspension of one or more of Plaintiffs' licenses will become public, even if Defendant does not independently publicize it.

59.     Patients come to Plaintiffs because they are known as providers of high-quality reproductive health care and the fact of their clinic's licensure statuses being in jeopardy will cause the public, including their patients, to think that Plaintiffs are "bad" or "unsafe" providers.

60.     In addition, a notice of "suspension" or "revocation" may cause members of the public, including Plaintiffs' patients, to be confused as to whether they can access abortion services at Plaintiffs' health centers.   Nor will this confusion be limited to abortion services; to the contrary, patients may be confused about their ability to continue receiving birth control, well-woman exams, testing and treatment for sexually-transmitted infections, and other reproductive health care at Plaintiffs' health centers once a notice of license suspension or revocation has been issued.

61.     In addition to interfering with Plaintiffs' mission of providing comprehensive reproductive healthcare, a license suspension or revocation notice may cause Plaintiffs harm through the loss of staff members who are concerned about their job security given that the health center's licensure status will be in jeopardy.

62.     Once a suspension or revocation takes effect, Plaintiffs will be forced to stop providing abortion services to its patients at that health center, substantially burdening Arkansas women's access to abortion as there are only three abortion providers in the state.

63.     If PPGP's health center in Fayetteville can no longer provide abortion, women will be forced to make the six-hour roundtrip journey from Fayetteville to Little Rock to access services.  And they will have to make this 380-mile roundtrip more than once, or stay away from home for several days, because Arkansas law requires that a woman receive certain state-mandated information in-person and then wait at least 48 hours until she may have an abortion. Ark. Code Ann. § 20-16-1703.

64.     Being forced to travel this significant distance, *twice*, or to stay overnight, will substantially delay some women in accessing abortion.  Women will need to arrange the necessary funds, transportation, childcare or time off work required to travel these distances and make these separate trips.  Especially for low-income women, women who have limited access to transportation, or women who are victims of abuse, these increased travel distances will, at a minimum, impose delays on their accessing care and, in some cases, will prevent them entirely from obtaining an abortion.

65.     Any delay is particularly problematic for women seeking medication abortion services because medication abortion is only available in Arkansas during the first ten weeks

LMP of pregnancy. If women are delayed past this point, they will no longer be eligible for medication abortion.

66.     Women choose medication abortion for a variety of reasons. For some women, it offers important advantages over surgical abortion. In particular, some women have medical conditions that make medication abortion a significantly safer option, with a lower risk of both complications and failure than a surgical abortion. Other women choose medication abortion because they fear any procedure with surgical instruments. Victims of rape, or women who have experienced sexual abuse or molestation, may choose medication abortion to feel more in control of the experience and to avoid the trauma of having instruments placed in their vagina. Additionally, many women prefer medication abortion because it feels more natural, like a miscarriage, and/or because they can complete a medication abortion in the privacy of their homes, with the company of loved ones, and at a time of their choosing.

67.     These delays will also impose significant burdens on women obtaining surgical abortion. While abortion is extremely safe, its risks increase with gestational age, as does the cost of the procedure.

68.     If LRFP's clinic is forced to stop providing abortions, there will be *no* surgical abortion provider, and *no* provider past ten weeks LMP, in all of Arkansas. Some women will attempt to seek surgical abortion care and care past ten weeks out of state, and of those women, some will succeed, but others will not. Some women will not be able to make the attempt.

69.     If LRFP and PPGP are forced to stop providing abortions at all three health centers, there would be *no* abortion providers in the entire state. Abortion access in Arkansas would be virtually eliminated.

70.     All of these burdens caused by the Act will come with no medical benefit whatsoever.   To the contrary, reducing or eliminating the availability of abortion services in Arkansas will harm women's health.

V.     **CLAIMS FOR RELIEF**

### COUNT I – RIGHT TO EQUAL PROTECTION

71.     Plaintiffs hereby reaffirm and reallege each and every allegation made in paragraphs 1–70 above as if set forth fully herein.

72.     The Act violates Plaintiffs' and their patients' rights to equal protection of the laws guaranteed by the Fourteenth Amendment to the United States Constitution, because it imposes mandatory license suspension or revocation on abortion clinics that it does not impose on other licensed health care facilities without adequate justification.

### COUNT II – RIGHT TO DUE PROCESS OF LAW

**(Liberty/Privacy)**

73.     Plaintiffs hereby reaffirm and reallege each and every allegation made in paragraphs 1–72 above as if set forth fully herein.

74.     The Act violates Plaintiffs' patients' rights to liberty and privacy as guaranteed by the Fourteenth Amendment to the United States Constitution by having a purpose and/or effect of  imposing an unconstitutional burden on their right to choose abortion.

### COUNT III – RIGHT TO DUE PROCESS OF LAW

**(Substantive Due Process)**

75.     Plaintiffs hereby reaffirm and reallege each and every allegation made in paragraphs 1–74 above as if set forth fully herein.

76.     The Act violates Plaintiffs' right to substantive due process as guaranteed by the Fourteenth Amendment to the United States Constitution because it imposes grossly excessive licensure penalties without adequate justification.

## VI.     REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court:

A.     Issue a declaratory judgment that the Mandatory Suspension/Revocation Provision, as codified at Ark. Code § 20-9-302(b), (b)(3)(A) & (b)(3)(A)(i), is unconstitutional and unenforceable;

B.     Issue permanent injunctive relief restraining Defendant and his employees, agents, and successors in office from enforcing the Mandatory Suspension/Revocation Provision;

C.     Grant Plaintiffs attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988; and;

D.     Grant such other and further relief as this Court may deem just, proper, and equitable.

Dated: June 20, 2017

/s/ Bettina E. Brownstein
Bettina E. Brownstein (85019)
Bettina E. Brownstein Law Firm
Cooperating Attorney, ACLU of Arkansas
904 West Second Street
Little Rock, AR 72201
(501) 920-1764
bettinabrownstein@gmail.com

*Attorney for Plaintiffs*

Jennifer Sandman*
Jennifer Keighley*
Planned Parenthood Federation of America
123 William St., 9th Floor
New York, NY 10038

(212) 261-4584
(212) 261-4749
jennifer.sandman@ppfa.org
jennifer.keighley@ppfa.org

Richard Muniz*
Planned Parenthood Federation of America
1110 Vermont Ave., NW, Suite 300
Washington, DC 20005
(202) 973-4997
richard.muniz@ppfa.org

*Attorneys for Planned Parenthood Arkansas
& Eastern Oklahoma d/b/a Planned
Parenthood Great Plains*

Susan Talcott Camp*
Ruth E. Harlow*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2633
tcamp@aclu.org
rharlow@aclu.org

*Attorneys for Little Rock Family Planning
Services*

*\*Applications for admission pro hac vice
pending*

# EXHIBIT A

**Stricken language would be deleted from and underlined language would be added to present law.**
**Act 383 of the Regular Session**

| | |
|---|---|
| 1 | State of Arkansas | *As Engrossed:  H2/10/17* |
| 2 | 91st General Assembly | **A Bill** |
| 3 | Regular Session, 2017 | HOUSE BILL 1428 |

1 State of Arkansas

*As Engrossed:  H2/10/17*

2 91st General Assembly

# A Bill

3 Regular Session, 2017                                      HOUSE BILL 1428

4

5 By: Representatives Lundstrum, Ballinger, Bentley, Cavenaugh, Coleman, Davis, Della Rosa, Dotson, C.

6 Douglas, Farrer, Gates, Gonzales, Hollowell, Jett, Lowery, Lynch, McCollum, D. Meeks, Miller, Penzo,

7 Payton, Pilkington, Richmond, Rye, B. Smith, Speaks, Warren, Watson, J. Williams

8 By: Senators Flippo, Bledsoe, A. Clark, B. Johnson

9

10                          **For An Act To Be Entitled**

11             AN ACT TO AMEND LAWS CONCERNING UNLAWFUL ABORTIONS;

12             TO AMEND LAWS CONCERNING THE PROCEDURE OF DENIAL,

13             SUSPENSION, OR REVOCATION OF A HEALTH FACILITIES

14             SERVICE LICENSE; TO AMEND THE LAWS REGARDING ABORTION

15             CLINICS; AND FOR OTHER PURPOSES.

16

17

18                                **Subtitle**

19             TO AMEND LAWS CONCERNING UNLAWFUL

20             ABORTIONS; TO AMEND LAWS CONCERNING THE

21             PROCEDURE OF DENIAL, SUSPENSION, OR

22             REVOCATION OF A HEALTH FACILITIES SERVICE

23             LICENSE; AND TO AMEND THE LAWS REGARDING

24             ABORTION CLINICS.

25

26

27 BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF ARKANSAS:

28

29       SECTION 1.  Arkansas Code § 5-61-101 is amended to read as follows:

30       5-61-101.  Abortion only by licensed ~~medical practitioner~~ physician.

31       (a)  It is unlawful for any person to induce another person to have an

32 abortion or to ~~willfully~~ knowingly terminate the pregnancy of a woman known

33 to be pregnant with the ~~intent~~ purpose to cause fetal death unless the person

34 is a physician licensed to practice medicine in the State of Arkansas.

35       (b)  ~~Violation~~ A violation of subsection (a) of this section is a Class

36 D felony.

As Engrossed:  H2/10/17                                                    HB1428

1        (c)  ~~Nothing in this section shall be construed to~~ This section does
2   not allow the charging or conviction of a woman with any criminal offense in
3   the death of her own unborn child in utero.

4

5        SECTION 2.  Arkansas Code § 20-9-302 is amended to read as follows:
6        20-9-302.  Abortion clinics, health centers, etc.
7        (a)(1)  A clinic, health center, or other facility in which the
8   pregnancies of ten (10) or more women known to be pregnant are willfully
9   terminated or aborted ~~each~~ in any month, including nonsurgical abortions,
10  shall be licensed by the Department of Health.
11        (2)(A)  ~~The facilities, equipment, procedures, techniques, and~~
12  ~~conditions of those clinics or similar facilities shall be subject to~~
13  ~~periodic inspection by the department~~ The department shall inspect a clinic,
14  health center, or other facility at least annually, and inspections shall
15  include without limitation:
16             (i)  The facilities, equipment, and conditions of a
17  clinic, health center, or other facility; and
18             (ii)  A representative sample of procedures,
19  techniques, medical records, informed consent signatures, and parental
20  consent signatures.
21        (B)  An inspector shall arrive at the clinic, health
22  center, or other facility unannounced and without prior notice.
23        (b)  The department ~~may~~ shall:
24        (1)  ~~adopt~~ Adopt appropriate rules ~~and regulations regarding~~,
25  including without limitation the facilities, equipment, procedures,
26  techniques, medical records, informed consent signatures, parental consent
27  signatures, and conditions of ~~clinics and other~~ clinics, health centers, and
28  other facilities subject to the provisions of this section to assure at a
29  minimum ~~that~~:
30             (A)  The ~~the~~ facilities, equipment, procedures, techniques,
31  and conditions are aseptic and do not constitute a health hazard~~.~~; and
32             (B)  The medical records, informed consent signatures, and
33  parental consent signatures meet statutory requirements;
34        (2)  Levy and collect an annual fee of five hundred dollars
35  ($500) per facility for issuance of a permanent license to an abortion
36  facility; and

1       *(3)(A)  Deny, suspend, or revoke licenses on any of the following*
2    *grounds:*
3          *(i)  The violation of any provision of law or rule;*
4    *or*
5          *(ii)  The permitting, aiding, or abetting of the*
6    *commission of any unlawful act in connection with the operation of the*
7    *institutions.*
8         *(B)(i)  If the department determines to deny, suspend, or*
9    *revoke a license, the department shall send to the applicant or licensee, by*
10   *certified mail, a notice setting forth the particular reasons for the*
11   *determination.*
12         *(ii)  The denial, suspension, or revocation shall*
13   *become final thirty (30) days after the mailing of the notice unless the*
14   *applicant or licensee gives written notice within the thirty-day period of a*
15   *desire for hearing.*
16         *(iii)(a)  The department shall issue an immediate*
17   *suspension of a license if an investigation or survey determines that:*
18           *(1)  The applicant or licensee is in*
19   *violation of any state law, rule, or regulation; and*
20           *(2)  The violation or violations pose an*
21   *imminent threat to the health, welfare, or safety of a patient.*
22         *(b)(1)  The department shall give the applicant*
23   *or licensee written notice of the immediate suspension.*
24          *(2)  The suspension of the license is*
25   *effective upon the receipt of the written notice.*
26         *(iv)  The denial, suspension, or revocation order*
27   *shall remain in effect until all violations have been corrected.*
28       *(C)  The applicant or licensee shall:*
29         *(i)  Be given a fair hearing; and*
30         *(ii)  Have the right to present evidence as may be*
31   *proper.*
32        *(D)(i)  On the basis of the evidence at the hearing, the*
33   *determination involved shall be affirmed or set aside.*
34         *(ii)  A copy of the decision, setting forth the*
35   *finding of facts and the particular grounds upon which it is based, shall be*
36   *sent by certified mail to the applicant or licensee.*

02-01-2017 08:21:17 JMB226

1          *(iii)  The decision shall become final fifteen (15)*
2    *days after it is mailed unless the applicant or licensee, within the fifteen-*
3    *day period, appeals the decision to the court.*
4          *(E)  A full and complete record of all proceedings shall be*
5    *kept and all testimony shall be reported, but it need not be transcribed*
6    *unless the decision is appealed or a transcript is requested by an interested*
7    *party who shall pay the cost of preparing the transcript.*
8          *(F)  Witnesses may be subpoenaed by either party and shall*
9    *be allowed fees at a rate prescribed by rule.*
10         *(G)  The procedure governing hearings authorized by this*
11   *section shall be in accordance with rules promulgated by the department.*
12         ~~(c)  The department may levy and collect an annual fee of five hundred~~
13   ~~dollars ($500) per facility for issuance of a permanent license to an~~
14   ~~abortion facility.~~
15         ~~(d)~~*(c)(1)  Applicants for a license shall file applications upon such*
16   *forms as are prescribed by the department.*
17         *(2)  A license shall be issued only for the premises and persons*
18   *in the application and shall not be transferable.*
19         ~~(e)~~*(d)(1)  A license shall be effective on a calendar-year basis and*
20   *shall expire on December 31 of each calendar year.*
21         *(2)  Applications for annual license renewal shall be postmarked*
22   *no later than January 2 of the succeeding calendar year.*
23         *(3)  License applications for existing institutions received*
24   *after that date shall be subject to a penalty of two dollars ($2.00) per day*
25   *for each day after January 2.*
26         ~~(f)~~*(e)  Subject to such rules and regulations as may be implemented by*
27   *the Chief Fiscal Officer of the State, the disbursing officer for the*
28   *department may transfer all unexpended funds relative to the abortion clinics*
29   *that pertain to fees collected, as certified by the Chief Fiscal Officer of*
30   *the State, to be carried forward and made available for expenditures for the*
31   *same purpose for any following fiscal year.*
32         ~~(g)~~*(f)  All fees levied and collected under this section are special*
33   *revenues and shall be deposited into the State Treasury,~~ there~~ to be credited*
34   *to the Public Health Fund.*
35
36         SECTION *3.*  Arkansas Code § 20-16-1703(d), concerning the informed

As Engrossed:  H2/10/17                                                          HB1428

1    consent requirement within the Woman's Right-to-Know Act, is amended to read
2    as follows:
3         (d)   A physician, facility, employee or volunteer of a facility, or any
4    other person or entity shall not require or obtain payment for a service
5    provided in relation to abortion to a patient who has inquired about an
6    abortion or scheduled an abortion until the expiration of the forty-eight-
7    hour reflection period required in this section.
8
9                              /s/Lundstrum
10
11
12                         APPROVED: 03/06/2017
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36

*Attorneys for Little Rock Family Planning Services*

*\*Applications for admission pro hac vice pending*

# EXHIBIT B



**ARKANSAS**
DEPARTMENT OF HEALTH

**2017 Legislative Session**
**Impact Statement**

| Bill Number: | HB1428  amendment #1 amendment |
|---|---|
| Title of Bill: | Amend laws concerning unlawful abortion; to amend laws concerning procedure for denial, suspension or revocation of health facilities service license; and to amend laws regarding abortion clinics |
| Bill Sponsor(s): | Representatives Lundstrum, Ballinger, Bentley, Cavenaugh, Coleman, Davis, Della Rosa, Dotson, C. Douglas, Farrer, Gates, Gonzales, Hollowell, Jett, Lowery, Lynch, McCollum, D. Meeks, Miller, Penzo, Payton, Pilkington, Richmond, Rye, B. Smith, Speaks, Warren, Watson, J. Williams<br>Senators Flippo, Bledsoe, A. Clark, B. Johnson |
| Bill Summary: | 5-61-101: Reduces the criminal mental/intent standard from "willful" to "knowing" and minor other wording changes.<br>20-9-302:<br>• Clarifies the number of performed abortions requiring a facility license from 10 "each" month to 10 "in any" month & requires  annual unannounced inspections with specific items to be reviewed during inspection. Requires said specified items to be included in rules and regulations adopted by department.<br>• Requires denial, suspension, revocation of license if facility violates any rule and violation poses imminent threat to patient health welfare or safety or is allowing unlawful conduct. Department to provide written notice via certified mail of suspension denial revocation. Suspension effective upon receipt of notice. Suspension denial revocation remains in place until violation is corrected. Licensee to be allowed hearing. |
| Strengths and Weaknesses: | W: If facility's license is suspended, post procedure patients care is likewise suspended including answering of hotline. No patient care of any type may be provided without an active license.<br>W: Bypasses Board of Health's authority for suspending license.<br>S: allows suspension of license to be temporary w/reinstatement upon correction of violation<br>S: Clarifies number of procedures performed requiring licensure. |
| Other: | • Holds abortion facilities to a suspension standard unlike all other licensed facilities. No other health care facility licensed via HFS, receives a suspended license upon inspection with rule violation.   Facilities such as hospitals, ambulatory surgery centers, submit plans of correction for each violation.  When a violation of imminent threat or harm is identified the survey process requires correction at time of survey with no license suspension. This bill requires suspension of the abortion facility license.<br><br>• Anticipate significant increase in complaint allegations in an effort to have facility license suspended as means of preventing this service to patients. It has not been uncommon for HFS to receive complaint allegations which are not substantiated upon investigation by HFS. |
| Fiscal Impact: | Estimated $1000.00 to agency per suspended license hearing.<br>Estimate $600-1000. Per complaint investigation (Staff time 8 hrs x 2  nurse @ 38$ hr. plus travel |
| Contact Name and Number: | Becky Bennett, HFS Section Chief (501) 661-2201 rebecca.bennett@arkansas.gov |