**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**

PLANNED PARENTHOOD ARKANSAS &                        PLAINTIFFS
EASTERN OKLAHOMA d/b/a PLANNED
PARENTHOOD GREAT PLAINS, on behalf
of itself and its patients, and LITTLE ROCK
FAMILY PLANNING SERVICES, on behalf
of itself and its patients

v.                                No. 4:17CV00401 JM

NATHANIEL SMITH, in his capacity as
Director and State Health Officer, Arkansas
Department of Health                                        DEFENDANT

<u>DEFENDANT'S RESPONSE IN OPPOSITION TO</u>
<u>PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>

Act 383 of the 91st Arkansas General Assembly rationally promotes women's health by strengthening enforcement of laws and regulations that protect women who have abortions from unsafe clinical practices and deficient medical recordkeeping at abortion clinics. Act 383 clarifies the scope of periodic inspections by the Arkansas Department of Health (hereinafter the Department), requires that the Department adopt appropriate rules on the keeping of patients' medical records and consent forms, and sets forth statutory requirements for processing violations of health safety violations. Act 383 defines the requirements for notice, establishes the right and requirements for administrative hearings on a notice of pending adverse action against a licensee, and provides for opportunity of a licensee to appeal from a determination of license suspension or revocation.

The Arkansas Department of Health has not revoked or suspended the abortion clinic operating license for either of Planned Parenthood's two Arkansas clinics or for Little Rock Family Planning Services' clinic. Indeed, unless either abortion facility violates health safety laws and regulations—laws and regulations they have not challenged—neither Planned

Parenthood nor Little Rock Family Planning Services will be affected by Act 383.  Nonetheless, in the absence of any present injury whatsoever, Planned Parenthood Arkansas & Eastern Oklahoma and Little Rock Family Planning Services have brought what amounts to a pre-enforcement challenge.  But they cannot establish either standing or ripeness, the *sine qua non* of the "case or controversy" requirement of Article III of the United States Constitution.

Even assuming *arguendo* that a "case or controversy" existed, the challenge from Planned Parenthood and Little Rock Family Planning Services has no merit.  They argue that the Equal Protection Clause prohibits the State from enforcing a licensing scheme that requires abortion facilities to follow these laws without also mandating that health facilities such as ambulatory surgical centers and freestanding birthing centers follow the same law.  But Arkansas's statutory and regulatory scheme governing the licensing of abortion facilities is separate and distinct from those governing these health facilities.  Because abortion facilities are unique and differently situated, Act 383 does not violate the Plaintiffs' right to equal protection under the law.  At the very least, the Plaintiffs have not met their burden of demonstrating that they are entitled to judgment as a matter of law on this claim, and their motion for summary judgment should be denied.

## FACTS AND BACKGROUND

Arkansas has distinct statutory and regulatory schemes governing the licensing of abortion clinics, on one hand, and the licensing of hospitals, ambulatory surgical centers, and other health facilities, on the other.  *Compare* Ark. Code Ann. § 20-9-201 et seq. (health facilities) *with* Ark. Code Ann. § 20-9-302 (abortion facilities); *compare* Ark. Admin. Code

007.05.17-1 et seq.[1] (hospitals and related institutions) *with* Ark. Admin. Code 007.05.2-4 et seq.[2] (abortion facilities).  Arkansas Department of Health's regulations governing hospitals and related institutions presently contain 407 pages, Def. Exh. 2, compared to only 36 pages for regulations governing abortion facilities. Def. Exh. 4. By further contrast, the unique regulations governing free-standing birthing centers presently contain 73 pages. Def. Exh. 3. There are numerous differences among these statutory and regulatory regimes.  For example, the yearly license fee for both ambulatory surgical centers and free-standing birthing centers is $1,000, but the yearly license fee for an abortion facility is only $500 even after Act 383's amendment to the statute. Ark. Code Ann. §§ 20-9-214(b) (ambulatory surgical center license fee); 20-9-404 (birthing center license fee); 20-9-302(b)(2) (abortion facility license fee).

Act 383, which takes effect on July 30, 2017, amended the statute governing the licensing of abortion facilities to require, among other provisions, that the Department of Health shall suspend or revoke the license of an abortion facility that violates any provision of law or rule. Ark. Code Ann. § 20-9-302(b)(3)(A)(i).  Act 383 provides that if the Department determines to suspend or revoke a license, it shall send the licensee a notice by certified mail setting forth the particular reasons for the determination. Ark. Code Ann. § 20-9-302(b)(3)(B)(i). The suspension or revocation of an abortion facility's license becomes final only after 30 days have elapsed from the mailing of the notice, and only if the licensee fails to give the Department written notice within that 30-day period of a desire for a hearing.  Ark. Code Ann. § 20-9-302(b)(3)(B)(ii).  The Department is required to give the licensee a fair hearing upon request, and the licensee shall

---

[1] The portion of the administrative code relating to health facilities is alternatively cited as AR ADC 016 24 007 et seq.

[2] The portion of the administrative code relating to abortion facilities is alternatively cited as AR ADC 007 05 004 et seq.

have the right at its hearing to present evidence.  Ark. Code Ann. § 20-9-302(C).  The licensee may subpoena witnesses.  Ark. Code Ann. § 20-9-302(b)(3)(F).  The Department is required to keep a full and complete record of all proceedings and to report all testimony.  Ark. Code Ann. § 20-9-302(b)(3)(E).  The Department must make a determination based on the evidence and testimony presented at the hearing to either affirm or set aside the license suspension or revocation, and must send the licensee a written decision setting forth the Department's finding of facts and the particular grounds upon which its decision is based.  Ark. Code Ann. § 20-9-302(b)(3)(D).  The licensee may appeal an adverse decision to court within 15 days.  *Id.*  The Act does not affect any entity unless that entity violates health safety laws and regulations.

Abortion is a unique procedure that is unlike any procedures performed in ambulatory surgical centers and free-standing birthing centers.  Abortion involves either the surgical extraction or medical expulsion of an unborn child from a woman's uterus along with the placenta and other tissue present because of conception.  These procedures often involve invasive scraping of the uterus and the use of sharp instruments to extract the "products of conception."  *See* Def. Exh. 1 at 2.  Because a woman's uterus is a vascularized, blood-rich organ, abortions pose a unique risk of serious complications, including post-abortion hemorrhage, cervical laceration, uterine perforation, uterine rupture, and infection.  *Id.* at 3-4; *see* Def. Exh. 7.  These complications can involve "bleeding in excess of 500 mL"—the loss of more than half a liter of blood.  Def. Exh. 1 at 3.

A blood-rich procedure like an abortion makes infections—a potentially underappreciated complication in the abortion clinic setting—a greater concern than it might otherwise be.  For that reason, inattentiveness to potential sources of infection inside an abortion clinic is a significant cause for concern.  The Plaintiffs have submitted exhibits with their motion

for summary judgment demonstrating they have been cited for numerous instances of inattentiveness to potential sources of infection that can affect their patients.

One inspection revealed that three-quarters of a Plaintiff-abortion facility's examination rooms contained damaged examination tables that could not be properly disinfected between patients.  Doc. 11-1 at 18-19.  The inspection report noted that "[t]hese failed practices had the potential to affect all patients examined in examination rooms #1-#3" of the clinic.  Doc. 11 at 19.  A Plaintiff-abortion facility has been cited for the use of torn and absorbent cloth stools in an ultrasound room that could not be disinfected (Doc. 11 at 27-28), and for having chairs in post-abortion recovery rooms that could not be disinfected between patients.  Doc. 11-2 at 4, 5 (stating that this violation "affected all patients who received treatment at the facility").

A Plaintiff-abortion facility was cited for having displaced and sagging ceiling tiles in a laundry room above the washer and dryer where a water leak had previously occurred—a source of potential contamination of clean laundry (Doc. 11-2 at 5)—for having three stained and brown ceiling tiles in a procedure room where a water leak had previously occurred—a source of potential contamination and a situation in which the abortion provider is unlikely to be alerted to discoloration from a new leak (*id.*)—and for its use of unlabeled solutions and powder in examination rooms where "the potential existed for the use of the solution/powder beyond an effective/expiration date or [to] be used improperly."  Doc. 11-1 at 2; *see id.* at 3-7 (similar violations).  In the latter instance, the report noted, "The failed practice had the potential to affect any patient treated in exam room #3 and #4 or the average of 20 patients seen in those rooms weekly."  Doc. 11-1 at 2.  A Plaintiff-abortion facility was cited for failing to develop a definition of nosocomial infections.  Doc. 11-1 at 26.  The report states, "Failure to develop definitions of nosocomial infections did not allow the Facility the opportunity to define what it

considered an infection, and to track and trend infections related to care received at the facility. The failed practice affected any patient receiving care at the Facility." *Id*. Further, the reports show that a Plaintiff-abortion facility was cited for keeping patient care products on the floor of a dirty storage room (Doc. 11-1 at 27); and storing reusable nasal hoods in a manner that "failed to assure patients were protected from likely sources of infection." Doc. 11-2 at 7. Each of these failures exposed patients to germ-laden equipment, potentially compromising the health of "all patients treated at the facility." Doc. 11-2 at 7.

Inspectors also cited multiple serious violations regarding medication inventory and administration, which negatively impacted any patient who was prescribed a medication. One inspection that the Plaintiffs failed to include among their exhibits shows that a Plaintiff-abortion facility administered an expired DEA-controlled sedative to over 180 patients without realizing that it was expired. Def. Exh. 5. The facility improperly stored syringes and intravenous tubing under a sink and left an oxygen mask on the floor. Def. Exh. 5. The same facility was cited for storing antibiotic tablets in unlabeled medicine cups in violation of its own pharmaceutical policies. *Id.* Another Plaintiff-abortion clinic had no medication administration policy. Doc. 11-1 at 24. The same Plaintiff-clinic also failed to maintain accurate counts of administered controlled substances (Doc. 11-2 at 8), retained supplies over three years past the expiration date (Doc. 11-1 at 10), and failed to discard opened single-use medications. Doc. 11-1 at 7.

Other inspections that the Plaintiffs failed to include among their exhibits show that one clinic failed to document whether "all medications were prescribed by the physician." Def. Exh. 8. This violation left the abortion clinic with no record of who was responsible for dispensing drugs, including doubling doses of abortion drugs and corticosteroids, tripling multiple patients'

Fentanyl dosages, and ordering administration of Narcan and Romazicon. *Id.* Failing to verify that a physician prescribed medication "had the potential for all patients admitted to the facility to receive the wrong dose or the wrong medication." *Id.* This same abortion clinic grossly disregarded needs of multiple patients once the women received abortions. On at least two occasions the facility "failed to assure . . . patients were discharged accompanied by a responsible adult," despite the fact that the patients had undergone sedation and could not be trusted to maintain their own safety. Def. Exh. 9. Inspections revealed more than a dozen other failures to authenticate information or correct errors in patients' medical records—including multiple instances of physicians failing to sign for an abortion procedure—which left the clinic with potentially incomplete and inaccurate medical records on its patients. Def. Exh. 8. One abortion clinic physician conducted an emergency examination of a patient experiencing severe pain, but failed to record any assessment notes regarding that pain. Def. Exh. 9.

Inspectors cited the Plaintiff-abortion clinics for violations that included gross negligence in record-keeping and even repeated incidents of intentionally-falsified records. One Plaintiff-abortion clinic repeatedly failed to document patients who were transferred from the clinic by ambulance to a hospital emergency room, instead falsely recording that the patients were discharged as ambulatory and in the care of friends. Doc. 11-2 at 10. Another recent inspection in October 2016 revealed that a Plaintiff-abortion facility had not updated its emergency contact list since 2014—despite regulations requiring revision every six months. Doc. 11-1 at 23. This hindered that Plaintiff-facility's ability to contact outside emergency responders in the event of a medical crisis, thus affecting every "patient, staff, or visitor who experienced an emergency or was in the Facility in the event of a disaster or untoward event." Doc. 11-1 at 23. This is particularly concerning because that Plaintiff-abortion clinic called for outside emergency

responders during the period in which its emergency contact list was out of compliance.  Doc. 11-2; Def. Exh. 6; Def. Exh. 7.

Finally, the Plaintiffs' exhibits reveal that one Plaintiff-abortion provider was cited for employing staff who lacked current tuberculosis screening and who were not certified in CPR. Doc. 11-1 at 8, 17.  Guidelines issued by the federal Center for Disease Control require that all healthcare workers must be initially tested for tuberculosis when they are hired.  *See* Paul A. Jensen, et al., *Guidelines for Preventing the Transmission of* Mycobacterium tuberculosis *in Health-Care Settings*, Ctrs. for Disease Ctrl. & Prevention, at App. C (2005).[3]  Workers must then comply with state guidelines regarding follow-up testing.  Ctrs. for Disease Control, *Tuberculosis: Testing Health Care Workers*.[4]  Yet the Plaintiffs dismiss their failure to comply with a federal regulation regarding the highly infectious disease of tuberculosis and the requirement that staff be trained in lifesaving CPR as "minor violations."  Doc. 9-1, ¶ 5.

## ARGUMENT

The Plaintiffs have moved for summary judgment on County I of their complaint, which alleges that Act 383 violates the rights of the Plaintiff-abortion clinics and their patients to equal protection under the law.  The Plaintiffs' equal protection challenge to Act 383 does not present a justiciable case or controversy.  *First*, Plaintiffs have no standing because they have no injury. There has been no enforcement of the Act against them.  Their licenses have not been suspended or revoked; indeed, the Department of Health has not so much as threatened to suspend or revoke their licenses.  And the Plaintiffs already (so the State assumes) employ best efforts to comply

---

[3] Available online at https://www.cdc.gov/mmwr/preview/mmwrhtml/rr5417a1.htm (last visited July 20, 2017).

[4] Available online at https://www.cdc.gov/tb/topic/testing/healthcareworkers.htm (last visited July 20, 2017).

with the governing laws and regulations.  Plaintiffs' theorized injury could only be based on a hypothetical future non-compliance (despite best efforts) with governing laws and regulations coupled with a hypothetical future inspection that uncovers the non-compliance.  This has never been enough to establish standing.

*Second*, except in the special and very different context of a First Amendment challenge for vagueness, Supreme Court and Eighth Circuit precedent teaches that pre-enforcement actions are not ripe for judicial review.  The instant challenge well illustrates the importance of the ripeness doctrine.  If, at some subsequent date, (1) an abortion facility violates the laws or regulations governing its conduct, (2) that violation is discovered, and (3) enforcement action is taken under this Act, the Court will have far more concrete facts on which to judge any equal protection challenge.  For just one example, the Plaintiffs speculatively allege that ambulatory surgical centers or freestanding birthing centers could violate a health safety violation with relative impunity while the Plaintiffs' clinics would be subject to license suspension or revocation for the same violation.  If the Plaintiffs are required to bring a claim ripe for judicial review, the Court will know whether the particular violation for which the abortion facility's license was suspended or revoked is one for which an ambulatory surgical center or free-standing birthing center would or would not also have their license automatically or routinely revoked or suspended.

Even assuming *arguendo* that a justiciable case or controversy existed, the Plaintiffs' claims have no merit.  Count I of the Plaintiffs' complaint claims that Act 383 facially violates the rights of both abortion clinics and abortion patients to equal protection under the law as secured by the Fourteenth Amendment to the United States Constitution.  Doc. 1 ¶ 72.  The Plaintiffs argue that section two of Act 383 is unconstitutional because it creates a requirement

that differs from those governing other health facilities such as ambulatory surgical centers and free-standing birthing centers. Yet the Plaintiffs do not contend that abortion clinics should be governed by the more extensive statutory and regulatory regime that governs these different types of facilities. The Plaintiffs thus seek to manufacture an equal-protection claim out of Act 383's mandate that abortion clinics follow the law. But Act 383 does not violate the Plaintiffs' equal protection rights because it is rationally related to furthering the State's legitimate interest in safeguarding women's health in the unique context of the abortion-provider facility.

The Plaintiffs claim in their motion for summary judgment that there exists no genuine issue of material fact related to Count I of their complaint and that they are entitled to judgment on that count as a matter of law. Doc. 9. Defendant Nathaniel Smith, Director of the Arkansas Department of Health, avers that there are disputed issues of fact regarding the seriousness and the number of the Plaintiffs' violations of health safety regulations found and noticed by the Department in the past five years.[5] These disputed facts may be material to the Plaintiffs' due process claims[6], but the Department, while disputing many of the Plaintiffs' allegations of fact, nevertheless agrees that there are no disputed issues of fact which are material to the Plaintiffs' equal protection claim. Assuming that this Court finds these disputed facts are not material to the Plaintiffs' equal protection claim, for the reasons set forth below, it is Defendant Smith—not the Plaintiffs—who is entitled to judgment as a matter of law on Count I of the Plaintiffs' complaint.

## I. The Plaintiffs' challenge to Act 383 is not a justiciable "case or controversy" because they lack standing and because their claim is not ripe for adjudication.

---

[5] *See* Defendants' Response to Plaintiff's Statement of Undisputed Facts, filed contemporaneously with this brief.

[6] The Plaintiffs have not moved for summary judgment on their due process claims.

It is undisputed that Act 383 modifies the statutory framework of health safety regulations under which abortion clinics in Arkansas must operate going forward.  The Plaintiffs here—three abortion clinics located in Arkansas—allege in Count I of their complaint that Act 383 violates their right to equal protection under the law because it establishes a health safety regulatory framework for abortion clinics that is more rigorous than the regulatory framework for other health facilities such as ambulatory surgical centers and freestanding birthing centers. The Plaintiffs also claim that Act 383 violates their future, hypothetical patients' constitutional rights by establishing an undue burden to those patients' decision to have an abortion.   The Plaintiffs' motion for summary judgment should be denied because they lack standing to bring their equal protection claim on behalf of themselves or on behalf of future, hypothetical patients, and because their equal protection claim against the Arkansas Department of Health is not ripe for adjudication.

A.      **The Plaintiffs have no standing to bring their equal protection claim against the Arkansas Department of Health, and their claim is not ripe for adjudication.**

Count I of the Plaintiffs' complaint alleges that Act 383 violates the abortion clinics' right to equal protection under the law by subjecting them to mandatory license suspension or revocation upon a finding of any violation of a health safety regulation, while other licensed health care facilities are not subject to the same mandatory penalties.   To have standing to challenge a statute in federal court, a plaintiff must demonstrate that he has suffered an "injury in fact," *i.e.*, "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement."  *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).   An injury in fact requires a "concrete and particularized" harm that is "'actual or imminent, not conjectural or hypothetical.'"  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)).  The Supreme Court has "repeatedly reiterated

that "threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 133 S. Ct. 1138, 1147 (2013) (quoting *Whitmore*, 495 U.S. at 158).

The Plaintiffs' motion for summary judgment fails to present undisputed facts of a "certainly impending" injury fairly traceable to the Defendants as required to establish Article III standing. *See Clapper v. Amnesty Intern.*, 568 U.S. 398, 408 (2013). The Plaintiffs' Statement of Undisputed Facts recites a sampling of their past violations of Arkansas Department of Health regulations applicable to abortion clinics, including violations of health regulations promulgated by federal agencies such as the Center for Disease Control. The Plaintiffs' motion for summary judgment does not set forth undisputed facts showing actual rather than imminent, conjectural, or hypothetical harm. Rather, the Plaintiffs' claim amounts to a glib, yet self-serving prognostication that, after Act 383 becomes enforceable, the Department will find that they have violated health safety regulations and they will—despite due process assurances incorporated into the law—be subject to certain suspension or revocation of their abortion facility licenses. The Plaintiffs conveniently mischaracterize in their argument that under Act 383 license suspension or revocation takes place immediately. To the contrary, and as a matter of law, Act 383 provides that upon a determination to suspend or revoke an abortion clinic license, the Department must notify the abortion clinic by certified mail of the particular reasons for the determination, provide the abortion clinic 30 days to request a hearing on the notice, and provide a "fair hearing" on the record with opportunity to present evidence. Ark. Code Ann. § 20-9-302(b). The abortion clinic then has 15 days to appeal the department's final decision to a court of competent jurisdiction. *Id.* Only if the abortion clinic fails to request a hearing does the mandatory suspension or revocation take effect, and then only after 30 days. *Id.*

Contrary to the Plaintiffs' allegations, there is no threatened or imminent suspension or revocation against any of abortion clinic.  The Plaintiffs have proffered no facts to demonstrate that any of them are subject to a pending enforcement action by the Arkansas Department of Health—much less a "certainly impending" action to suspend or revoke their licenses.  Thus, the Plaintiffs have failed to demonstrate an impending threat of injury in fact, and failed to establish as a matter of law that Act 383 violates their right to equal protection under the law.  This Court should, therefore, deny summary judgment on Count I of the Plaintiffs' complaint for lack of standing.

In addition to Plaintiffs' lack of standing, their equal protection challenge is not ripe for judicial review.  Ripeness is a justiciability doctrine designed, among other reasons, to protect administrative agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.  *National Park Hospitality Ass'n v. Department of Interior*, 538 U.S. 803, 807 (2003).  Under the ripeness doctrine, a plaintiff's claim will be denied judicial review and adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.  *Texas v. United States*, 523 U.S. 296, 300 (1998).

In *National Park Hospitality Ass'n v. Dep't of Interior*, the Supreme Court applied a two-part inquiry to the issue of whether a plaintiff's claim against an administrative agency was ripe for adjudication, evaluating 1) the issue's fitness for a judicial decision and 2) the hardship to the parties of withholding court consideration. 538 U.S. 803, 808 (2003). Applying this two-part test to the facts of this case, it is readily apparent that the Plaintiffs' challenge to Act 383 is not ripe for adjudication.   Act 383 compels the Department of Health to adopt appropriate rules related to facilities, equipment, procedures, techniques, medical records, informed consent signatures,

parental consent signatures, and conditions of all facilities subject to the provisions of the statutory regulation on abortion clinics.  Doc. 1, p. 28.  It is undisputed that the department has not yet adopted rules as required by the Act.[7]  Subjecting an agency to premature review "denies the agency an opportunity to correct its own mistakes and to apply its expertise."  *FTC v. Standard Oil Co. of Cal*, 449 U.S. 232, 244 (1980).

Moreover, the Plaintiffs have stated no facts to demonstrate the possibility of enduring any hardship under Act 383.  The harm the Plaintiffs allege they will suffer if Act 383 takes effect is merely speculative.  Despite the Plaintiffs' mischaracterizations, Act 383 taking effect will not work to immediately shut down all abortion clinics.  To the contrary, the act contains within it assurances that abortion clinics will receive due process in any action by the department to suspend or revoke an abortion clinic's operating license, including an administrative hearing and the right to a judicial review of any adverse administrative ruling.  Ark. Code Ann. § 20-9-302(b).  Further, the Plaintiffs' claim ignores the simple fact that they may avoid any possible adverse action against their licensure by doing what is already legally required of them: abide by the laws and regulations already in place that regulate their abortion clinic operations.

The ripeness doctrine is highly important for another reason: It ensures that courts do not make judicial pronouncements regarding the laws of coordinate branches of government—or in this case sovereign states—unless absolutely necessary to the resolution of a concrete, non-abstract dispute.  And it ensures the judiciary's decision is based on, and limited to, specific facts as opposed to hypothetical matters.  Here, for example, the Court should not proceed to even examine an equal-protection claim until it knows what violations are the basis for a particular facility's license revocation or suspension—if that even occurs.  These are the type of necessary

_____

[7] The Defendant avers that the Department of Health may, within the scope of its statutory requirement, draft and adopt regulations that would render any equal protection claim moot.

concrete facts that are not available now and their absence renders the current matter unripe for judicial review.

In short, the Plaintiffs' equal protection claim in Count I of their complaint is not ripe for judicial review because the impact of the law cannot "be said to be felt immediately by those subject to it in conducting their day-to-day affairs" and "no irremediably adverse consequences flow from requiring a later challenge." *National Park Hospitality Ass'n*, 538 U.S. at 810. Because Plaintiffs lack standing to challenge Act 383 under the Equal Protection Clause, and because Count I of the Plaintiffs' complaint is not ripe for judicial review, this Court should deny the Plaintiffs' motion for summary judgment and instead enter judgment as a matter of law in favor of Defendant on Count I.

> **B.    The Plaintiffs lack standing to assert the rights of hypothetical future patients because there is a conflict between the Plaintiffs' interests and those patients' interests.**

A litigant who brings a complaint in federal district court "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (citation omitted). A plaintiff may assert the rights of a third party only when (1) the litigant and the third party who actually possesses the constitutional right bear a close relationship to one another; and (2) there exists some hindrance to the third party's ability to protect her own interests. *Singleton v. Wulff*, 428 U.S. 106, 114 (1976); *Kowalski*, 543 U.S. at 130. The Supreme Court in *Kowalski* observed that it has historically only approved third-party standing in cases where the plaintiff is asserting the rights of *known* claimants because there can be no close relationship between a plaintiff who purports to assert the constitutional rights of a *hypothetical* third party. *Kowalski*, 543 U.S. at 131, 134.

Over 40 years ago the Supreme Court addressed third-party standing in the context of an abortion case in *Singleton v. Wulff*, 428 U.S. 106 (1976).  The plaintiffs in *Singleton* were two licensed abortion-provider physicians who claimed that a Missouri statute that excluded elective abortions from Medicaid coverage was unconstitutional because the statute deprived them of their right to practice medicine, deprived their patients of the fundamental right to decide to have an abortion, infringed upon their right and the right of their patients to receive safe and adequate medical advice and treatment, and deprived them and their patients, "each in their own classification, of the equal protection of the laws."  *Singleton*, 428 U.S. at 110.  The defendants moved to dismiss on grounds, among others, that the plaintiffs lacked standing to litigate alleged deprivation or infringement of the civil rights of their welfare patients.  *Id*.  A plurality of the Court in *Singleton* upheld a ruling by the Eighth Circuit Court of Appeals that the plaintiffs had standing to assert constitutional claims of their patients, concluding, "it generally is appropriate to allow a physician to assert the rights of women patients as against governmental interference with the abortion decision." *Singleton*, 428 U.S. at 114.  The plurality conceded, however, that this general rule of third-party standing in abortion cases, like any general rule, should not be applied where its underlying justifications are absent.  *Singleton*, 428 U.S. at 114.

The "general appropriateness" rule of standing in *Singleton* is specifically inappropriate in this case because the underlying justifications for the rule—a close relationship between the litigant and the third party, and some hindrance to the third party's ability to protect her own interests—are completely absent in this case.  First, the close relationship that the Supreme Court found existed between the plaintiffs and their patients in *Singleton* cannot be found in this case.  In *Singleton*, the statute at issue eliminated Medicaid funding for elective abortions.  Thus, the interests of the plaintiff-physicians and their patients were directly aligned: patients who lacked

personal financial resources necessary to seek and obtain an abortion were interested in maintaining public funding of abortions, and the physicians who performed abortions on those patients were interested in being paid for their services.  Act 383, however, neither places any cognizable restriction on the abortion process nor, similar to *Singleton*, limits the availability of abortion procedures to women who decide to have an abortion.  Rather, Act 383 amends and strengthens the framework of health safety regulations under which abortion clinics must operate—an activity the Plaintiffs here naturally oppose, but which is rationally related to the State's compelling interest in protecting the health of women who choose to have an abortion.

When a state enacts regulations to protect the health and safety of abortion patients, the interests of physicians and patients diverge, and there is "no relationship at all" between the physicians and their hypothetical future patients—much less a close relationship.  *Kowalski*, 543 U.S. at 126.  Moreover, third-party standing is proscribed if the interests of the litigant and the third-party rights-holder are even "potentially in conflict."  *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 15 (2004); *see also Kowalski,* 543 U.S. at 135 (Thomas, J., concurring) (noting that third-party standing is disallowed when the litigants "may have very different interests from the individuals whose rights they are raising"); *Canfield Aviation, Inc. v. Nat'l Transp. Safety Bd.*, 854 F.2d 745, 748 (5th Cir. 1988) ("[C]ourts must be sure that the litigant and the person whose rights he asserts have interests which are aligned.").  This law on third-party standing is all the more forceful where—as here—there is a clear conflict of interest between the Plaintiffs and their patients.

"Even where the relationship is close, the reasons for requiring persons to assert their own rights will generally still apply."  *Singleton*, 428 U.S. at 116.  The requirement that there be some genuine obstacle to the ability of a third party to assert her own right further dictates that

the Plaintiffs here have no standing to bring a challenge to Act 383 on behalf of their future patients.  Act 383 works to strengthen existing health safety measures in the State's regulation of abortion clinics by providing that the Defendant Department of Health shall adopt appropriate rules to assure at a minimum that "facilities, equipment, procedures, techniques and conditions are aseptic and do not constitute a health hazard."  Ark. Code Ann. § 20-9-302(b)(1)(A).  Act 383 further ensures that women who elect to have an abortion do so with counseled, informed consent by providing that the Department of Health shall adopt appropriate rules to assure that "medical records, informed consent signatures, and parental consent signatures meet statutory requirements."  *Id.* § 20-9-302(b)(1)(B).  It strains credulity that the Plaintiffs have third-party standing to bring a self-serving constitutional claim on behalf of hypothetical women against a law that protects those women's health and ensures that they are given informed consent.

The abortion-clinic Plaintiffs here do not have standing on behalf of third-party women to assert a constitutional claim to invalidate legislation that is rationally related to the protection of those same women against unsafe practices of the abortion clinics.  With respect to the Plaintiff's claim under Count I brought on behalf of the Plaintiffs' hypothetical patients, this Court should deny the Plaintiffs' motion for summary judgment for lack of standing and instead enter judgment as a matter of law in favor of Defendant on Count I.

## II.   The Plaintiffs' equal-protection claim against Act 383 is subject only to rational-basis review.

Legislation is presumed to be valid and will be judicially sustained against a constitutional challenge if the classification drawn by the statute is rationally related to a legitimate state interest.  *Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440 (1985).  Strict judicial scrutiny is triggered only if a statute "operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution[.]"

*Maher v. Roe*, 432 U.S. 464, 470 (1977); *see also Knapp v. Hanson*, 183 F.3d 786, 789 (8th Cir. 1999).   Where legislation neither invades a fundamental constitutional right nor purposefully operates to the detriment of a suspect class, the only requirement of equal protection is that the legislation be rationally related to a legitimate government interest.   *Harris v. McRae*, 448 U.S. 297, 326 (1980).   Here, because Act 383 does not burden a fundamental right or affect a suspect class, the Plaintiffs' challenge to the statute is subject to only rational-basis review.

Abortion clinics do not have a fundamental right to provide abortion procedures. *Planned Parenthood of Mid-Missouri & E. Kansas, Inc. v. Dempsey*, 167 F.3d 458, 464 (8th Cir. 1999).   Any constitutional right of abortion clinics to provide abortion services to women is derivative of women's constitutional right to choose abortion.   *Id.* (citing *Planned Parenthood v. Casey*, 505 U.S. 833, 884–85 (1992); *accord Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 547 (9th Cir. 2004) ("Because the right to perform abortions is derivative of the right of patients to seek abortions, it is not the sort of right that, apart from the rights of patients, would trigger strict scrutiny review.").   Neither may abortion providers use their patients' right to choose to have an abortion as a means of elevating the standard of review for their own equal protection claim.   *See Birth Control Centers, Inc. v. Reizen*, 743 F.2d 352, 358 (6th Cir. 1984).   Act 383 does not infringe a fundamental right for equal-protection purposes because it violates no constitutionally-protected substantive right.   *Harris v. McRae,* 448 U.S. 297, 312, 322 (1980) (concluding that there is no equal protection violation where the Hyde Amendment violated no constitutionally-protected substantive right).   Act 383, therefore, does not burden any fundamental right of the Plaintiff-abortion providers.

As set forth above, Plaintiffs lack standing to bring their challenge to Act 383 on behalf of their hypothetical future patients.   But assuming that the Plaintiffs had standing to do this—

which they do not—their claim that Act 383 must be subjected to strict scrutiny still fails as a matter of law because—contrary to the Plaintiffs' claim (Doc. 10 at 8-9)—there is no fundamental constitutional right for their patients to access abortion services. *Planned Parenthood of SE Pennsylvania v. Casey*, 505 U.S. 833, 953 (1992) (controlling plurality opinion) ("The Court in *Roe* went too far when it…deemed the right to abortion fundamental."). Legislation affecting physicians and clinics that perform abortions will be found unconstitutional only if it imposes an undue burden on women seeking abortions. *Dempsey*, 167 F.3d at 464; *Casey*, 505 U.S. at 884-85. Here, there is no undue burden because a law that does not prohibit abortion but rather has only an incidental effect on a woman's decision to have an abortion—and Act 383 is such a law—cannot create an undue burden. *Casey*, 505 U.S. at 874.  It cannot be disputed that Act 383 does not in any way prohibit abortion, but rather has only an incidental effect of regulating abortion clinics in Arkansas that provide the specified number of abortions per month.  Thus, the Plaintiffs have failed to establish that they are entitled to judgment as a matter of law on their equal protection challenge to Act 383 on behalf of their hypothetical future patients.  This Court should, therefore, deny Plaintiffs' motion for summary judgment and instead issue summary judgment in favor of Defendant Smith.

Neither abortion providers nor their patients are a suspect class under the Equal Protection Clause of the Fourteenth Amendment.  Suspect classifications include race, religion, alienage, and national origin. *Attorney Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 906 n.6 (1986); *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976).  In addition, the U.S. Supreme Court has recognized quasi-suspect classifications based on sex and illegitimacy also receive some degree of heightened scrutiny.  *Clark v. Jeter*, 486 U.S. 456, 461 (1988).  But neither abortion providers nor their patients fall into any of these classifications.  *Bray v. Alexandria Women's*

*Health Clinic*, 506 U.S. 263, 269 (1993) ("'Women seeking abortion' is not a qualifying class" for equal protection purposes).   Even if—as the Plaintiffs claim—abortion providers were subject to prejudice under Act 383, which they are not, it would not be appropriate to afford them suspect-class status under the Equal Protection Clause where there are also many legitimate reasons that the State might single them out for regulation.   *See Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 545 (9th Cir. 2004).

Contrary to the Plaintiffs' claim (Doc. 10 at 9), enacting different regulatory frameworks for different types of professional licenses does not trigger heightened scrutiny under the Equal Protection Clause.   *Crum v. Vincent*, 493 F.3d 988, 994 (8th Cir. 2007) (holding that rational-basis review was proper both where a law requiring revocation of a professional license in certain circumstances did not apply to other professions and where a member of one profession faced a more severe sanction than members of other professions for a similar violation). Classifications that specifically distinguish between abortion providers and other facilities or physicians are subject to rational-basis review.   *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 547 (9th Cir. 2004) (applying rational-basis review to a statute that imposed restrictions on abortion providers but not other physicians who performed equally-risky procedures).   "Abortion is inherently different from other medical procedures, because no other procedure involves the purposeful termination of a potential life."   *Harris v. McRae*, 448 U.S. 297, 325 (1980) (holding that the Hyde Amendment's restricting federal reimbursement for certain medically-necessary abortions but not for medically-necessary services generally was appropriately subject to rational-basis review).   *See also Women's Med. Ctr. of Nw. Houston v. Bell*, 248 F.3d 411, 419 (5th Cir. 2001) (holding that a statute requiring only facilities that perform a certain number of abortions per year to obtain a special license that is potentially subject to revocation is subject to

rational-basis review).  Abortion clinics may rationally be regulated as a class while other clinics or medical practices are not.  *Greenville Women's Clinic v. Bryant*, 222 F.3d 157, 159 (4th Cir. 2000) (applying rational-basis review to a statute setting standards for licensing abortion clinics); *Birth Control Centers, Inc. v. Reizen*, 743 F.2d 352, 358 (6th Cir. 1984) (applying rational-basis review to a statute regulating freestanding surgical outpatient facilities but not the physicians' private offices where abortions are performed). Drawing distinctions between abortion and other procedures is not forbidden.  *Bellotti v. Baird*, 428 U.S. 132, 149 (1976); Planned Parenthood of Central Missouri v. Danforth, 428 U.S. 52, 79 (1976).  Thus, neither abortion providers nor their patients are a suspect class under the Equal Protection Clause, and Act 383 is subject to rational-basis review.

### III.    Act 383 is rationally related to the State's compelling interest in protecting the health and safety of women who seek abortion services at the Plaintiffs' facilities.

Section two of Act 383 will be upheld against an equal protection challenge if "there is any reasonably conceivable state of facts that could provide a rational basis for the classification."  *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993).  The U.S. Supreme Court has recognized that state legislatures have "the widest possible latitude within the limits of the Constitution."  *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973) (quotation and citation omitted).  Because a legislature is not required to articulate its reasons for enacting a statute, it is entirely irrelevant for purposes of constitutional review whether the conceived reason for a challenged distinction in the law actually motivated the legislature. *Beach Communications, Inc.*, 508 U.S. at 315.  A court should not assume that the legislature's "action is capricious, or that . . . it was not aware of facts which afford reasonable basis for its action." *Lehnhausen*, 410 U.S. at 364-65 (quotation and citation omitted).  "There is a presumption of constitutionality which can be overcome only by the most explicit demonstration

that a classification is a hostile and oppressive discrimination against particular persons and classes." *Id.* at 364 (quotation and citation omitted).  The burden is on the plaintiff to negate every conceivable rational basis that might support the legislation.  *Id.*

Further, rational-basis review does not require that the challenged legislation is a perfect or exact fit between the means used and the ends sought.  *United States v. Johnson*, 495 F.3d 951, 963 (8th Cir. 2007).  "[T]he basis for a reasonable distinction need not apply in every circumstance to be valid."  *Walker v. Hartford Life & Accident Ins. Co.*, 831 F.3d 968, 978 (8th Cir. 2016); *see Williamson v. Lee Optical of Oklahoma Inc.,* 348 U.S. 483, 487-88 (1955) ("[T]he law need not be in every respect logically consistent with its aims to be constitutional.").

Here, the Plaintiffs have failed to meet their heavy burden of showing that Act 383 is irrational by negating every conceivable rational basis that might support the legislation.  For example, the Plaintiffs cannot negate the rational bases provided by the State's legitimate interest in protecting women's health.  *Casey*, 505 U.S. at 846.  Act 383 rationally promotes women's health by enforcing compliance with laws governing abortion clinics that protect patients undergoing the uniquely-private and blood-rich procedures conducted therein.

Courts have recognized that there are conceivable rational bases for strict regulation of abortion facilities, including "that women who obtain abortion services are less likely to report irresponsible practices or less likely to litigate medical malpractice claims, due to the fact that obtaining an abortion is an exercise of a private choice."[8]  *Tucson Woman's Clinic*, 379 F.3d at 545.  Indeed, patients of an ambulatory surgical center who are injured while having various

---

[8] Plaintiffs in abortion cases uniformly assert the right to decisional privacy, and they sometimes assert that the right to privacy protects a woman's decision to have an abortion from being disclosed as a putative "right to informational privacy." *See, e.g.*, *Hopkins v. Jegley, et al.*, Case No. 4:14CV00404 (E.D. Ark.), ECF 1 at 28, 30 (Counts V and VIII), filed simultaneously in the Eastern District of Arkansas with the instant case.

surgical procedures—ones less privacy-invoking compared to abortion procedures—are far more likely to enforce their rights by asserting a malpractice claim against an irresponsible physician. Alternatively, "[a] State might look to the history of illegal, unsafe abortions in this country and determine that women seeking abortions are particularly vulnerable to exploitation." *Id.* These rational bases support Act 383 as a matter of law.

Although the Plaintiffs insinuate that section two of Act 383 is motivated by animus or political pressure (Doc. 10 at 12-13), they have not attempted to present evidence that the General Assembly was moved to act by any improper motive.  To the contrary, the Plaintiffs even observe that the Act's sponsor stated during legislative debates that the law "protects the health of the patient."  Doc. 1 at 13 ¶ 48.  The Plaintiffs have made no showing that there is a dispute of fact on these issues—to say nothing of showing that they are entitled to judgment as a matter of law.  Moreover, even if the Plaintiffs could prove that state legislators were motivated by animus toward a class such as abortion providers—which they cannot—the Defendants could still negate the Plaintiffs' equal-protection claim by showing that Act 383 serves a purpose that is rationally related to a legitimate state interest.  *Beach Communications, Inc.*, 508 U.S. at 313.  It is not necessary to show that legislators were motivated by the asserted rational purpose.  *Id.* Here, Act 383's regulatory framework for abortion clinics is rationally related to the State's compelling interest in protecting the health and safety of its citizens, including women who choose to have abortions at the Plaintiffs' facilities.

Next, the Plaintiffs argue that Act 383 violates the Equal Protection Clause because—as they erroneously contend—abortion clinics in Arkansas are similarly situated to ambulatory surgical centers and free-standing birthing centers.  Doc. 10 at 10.  But the logic of this argument fails because it illicitly depends upon an apples-to-oranges comparison.  This is evident from the

fact that, in Arkansas, ambulatory surgical centers and free-standing birthing centers are subject to *different* licensing regimes than abortion facilities.   Arkansas has distinct statutory and regulatory schemes governing the licensing of abortion clinics, on one hand, and the licensing of hospitals, ambulatory surgical centers, and related health facilities, on the other.   *Compare* Ark. Code Ann. § 20-9-201 et seq. (health facilities) *with* Ark. Code Ann. § 20-9-302 (abortion facilities); *compare* Ark. Admin. Code 007.05.17-1 et seq. (hospitals and related institutions) *with* Ark. Admin. Code 007.05.2-4 et seq. (abortion facilities).

These differing licensing schemes render inapposite cases from other jurisdictions cited by the Plaintiffs where health facilities and abortion clinics were treated differently even though they were subject to the same licensing scheme.   For example, the Plaintiffs point to a case from the Western District of Missouri where on equal protection grounds the court enjoined the State's efforts to revoke an abortion clinic's license.   *Planned Parenthood of Kansas v. Lyskowski*, Case No. 2:15-CV-04273-NKL, 2016 WL 2745873, at *1 (W.D. Mo. May 11, 2016).   The court found that "Missouri law requires that all abortion facilities be licensed as ASCs [ambulatory surgical centers]."   *Id.* at *2.   "Thus, general ASCs and abortion facility ASCs are subject to the same statute for purposes of enforcement and management of their licenses."   *Id.* at *6.   The only regulatory distinction in Missouri between general ambulatory surgical centers and abortion-facility ambulatory surgical centers was a slight difference in their admitting-privileges requirements.   *Id.* at *5-6.   Because in Missouri general ambulatory surgical centers and abortion-facility ambulatory surgical centers were similarly situated, the Court went on to find that there was no rational basis for disparate treatment of the abortion facility. *Id.*

But, unlike Missouri, Arkansas abortion facilities are not licensed as ambulatory surgical centers.   Nor are their licenses governed by the same statute as ambulatory surgical centers.

Rather, abortion facilities are subject to an independent regulatory framework that is actually less onerous than the regulations that apply to ambulatory surgical centers.  Therefore, abortion facilities in Arkansas are not similarly situated to ambulatory surgical centers, and *Lyskowski* and similar cases are inapposite.[9]

In *Tucson Woman's Clinic*, the Ninth Circuit considered whether a statutory and regulatory scheme that set mandatory standards for abortion facilities in many areas of practice—including administration, personnel, staffing requirements, the abortion procedure itself, patient transfer and discharge, medications, medical records, equipment, and physical facilities—violated the equal protection rights of patients or physicians by discriminating between doctors who provide abortions and those who provide comparably risky medical procedures. 379 F.3d at 543-47. The plaintiffs argued that the scheme was unnecessary and stigmatized abortion providers. *Id.* at 546. The court held that "[t]he scheme does not violate the equal protection clause in a judicially cognizable manner . . .  by distinguishing between abortion providers and other physicians . . . ." *Id.* at 538. Applying rational-basis review, the court specifically found that "the law is facially related to health and safety issues, and no evidence has been presented that is sufficient to create an issue of material fact as to whether there is a stigmatizing or animus based purpose to the law." *Id.*

Like the plaintiffs in *Tucson Women's Clinic*, the Plaintiffs here argue that the State's requirements that abortion facilities follow the law or be subject to mandatory license suspension or revocation is unnecessary and stigmatizes abortion providers.  But because the mandatory standards are facially related to health and safety issues, and because the Plaintiffs have

---

[9] It goes without saying that a trial court decision from a federal district court in Missouri provides only minimally persuasive authority to this Court's review in this case.

submitted no evidence that Act 383 has an improper purpose, there is no equal protection violation as a matter of law.

As set forth above, the record shows that Plaintiffs have been cited for numerous violations that threaten women's health and safety. Plaintiffs' characterization of these violations as "minor" fails to do justice to, among other things, the unique blood-rich procedures routinely performed at abortion facilities and the risk of serious complications that unsanitary conditions pose to patients undergoing an abortion.[10] There are numerous undisputed facts present in this case demonstrating that the Plaintiffs' history of health safety regulatory violations presents far more than minor issues, as they allege.

The Plaintiffs, in their motion for summary judgment and accompanying statement of facts, selectively disclose only part of their past violations of Arkansas Department of Health regulatory standards. Further review of abortion clinic inspection records that Plaintiffs failed to include in their exhibits indicates that one clinic failed to document whether "all medications were prescribed by the physician." Def. Exh. 8. This violation left the abortion clinic with no record of who was responsible for dispensing drugs, including doubling doses of abortion drugs and corticosteroids, tripling multiple patients' Fentanyl dosages, and ordering administration of Narcan and Romazicon. *Id.* Failing to verify that a physician prescribed medication "had the potential for all patients admitted to the facility to receive the wrong dose or the wrong medication." *Id.* Dire consequences could have resulted, especially since the prescriptions affected included controlled sedatives.

---

[10] At the very least, the question of whether abortion facilities' unsanitary conditions and violations of health department regulations present substantial risks to the health of their patients is a genuine issue of material fact that precludes summary judgment in the Plaintiffs' favor.

This same abortion clinic grossly disregarded needs of multiple patients once the women received abortions.  On at least two occasions, the facility "failed to assure . . . patients were discharged accompanied by a responsible adult," despite the fact that the patients had undergone sedation and could not be trusted to maintain their own safety.  Def. Exh. 9.  Inspections revealed more than a dozen other failures to authenticate information or correct errors in patients' medical records—including multiple instances of physicians failing to sign for an abortion procedure—which left the clinic with potentially incomplete and inaccurate medical records on its patients. Def. Exh. 8.  One abortion clinic physician conducted an emergency examination of a patient experiencing severe pain, but failed to record any assessment notes regarding that pain.  Def. Exh. 9.  Without accurate, up-to-date medical records, the clinic risked duplicating or failing to administer necessary medications, could not assure that its patients received essential care, and otherwise jeopardized patient safety.

The State is justified in strictly regulating abortion facilities on the basis that "that women who obtain abortion services are less likely to report irresponsible practices or less likely to litigate medical malpractice claims, due to the fact that obtaining an abortion is an exercise of a private choice." *Tucson Woman's Clinic*, 379 F.3d at 545.  Likewise, "[a] State might look to the history of illegal, unsafe abortions in this country and determine that women seeking abortions are particularly vulnerable to exploitation." *Id.*  In any case, Act 383 is a valid exercise of the General Assembly's legislating authority because the law provides protections that are rationally related to the State's compelling interest in protecting women's health.

## CONCLUSION

The Plaintiffs' claims are not ripe for adjudication because the Department has yet to adopt regulations under Act 383, and the harm the Plaintiffs allege they will suffer under Act 383

is speculative and not sufficiently concrete and impending.  The Plaintiff-abortion clinics bear no close relationship to their patients in the matter of health safety regulations imposed upon the abortion clinics, and the abortion clinics' interests are not aligned with the patients' interest in heightened health safety requirements.  Neither are patients burdened from claiming their own interests related to Act 383.  For these reasons the Plaintiffs' motion for summary judgment should be denied for lack standing to bring an equal protection challenge to Act 383.

Because Act 383 does not burden any fundamental right or suspect class, the Plaintiffs' equal protection challenge is reviewed for rational basis.  The Plaintiffs' equal protection claim on behalf of their hypothetical patients—which they have no standing to bring—fails to establish that Act 383 presents an undue burden to their hypothetical patients' decision to have an abortion and therefore fails as a matter of law.  Act 383 survives rational basis review because it rationally promotes women's health by enforcing compliance with laws governing abortion facilities that protect patients undergoing the uniquely-private, blood-rich procedures conducted therein. For these reasons the Plaintiffs' equal-protection challenge to Act 383 fails as a matter of law.

For all of these reasons, Defendant Nathaniel Smith, on behalf of the Arkansas Department of Health, respectfully requests that the Court deny the Plaintiffs' motion for summary judgment on Count I and instead enter judgment as a matter of law in his favor.

Respectfully submitted,

LESLIE RUTLEDGE
Attorney General

By:    */s/ Monty Vaughan Baugh*
Monty Vaughan Baugh (Ark. Bar No. 2008138)
Deputy Attorney General

Jennifer L. Merritt (Ark. Bar No. 2002148)
Senior Assistant Attorney General

Michael A. Cantrell (Ark Bar No. 2012287)
Assistant Attorney General

Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
Ph: (501) 682-2007
Fax: (501) 682-2591

Email:    Monty.Baugh@ArkansasAG.gov
            Jennifer.Merritt@ArkansasAG.gov
            Michael.Cantrell@ArkansasAG.gov

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I, Monty V. Baugh, hereby certify that on July 24, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which shall send notice to all counsel of record.

*/s/ Monty V. Baugh*
Monty V. Baugh